Filed 06/25/26

VERMONT SUPERIOR COURT

Chittenden Unit
175 Main Street
Burlington VT 05401
802-863-3467
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 26-SC-01117

---

Carmen Koren v. Katherine F. Betancourt

---

# TRIAL DECISION

Plaintiff Carmen Koren brought this case against defendant Katherine Betancourt to collect payments Koren alleges Betancourt owes for a loan, plain tickets and a work permit. Trial took place on Jun. 23, 2026. Both parties represented themselves.

Koren testified on her own behalf. She ran out of time to call additional witnesses. Betancourt testified on her behalf and also called her husband, Franklin Abea, and her uncle (Koren's brother) Juan Betancourt ("Juan").

## I.      Findings of Fact

The court makes the following findings of fact, based on a preponderance of the credible evidence admitted at trial focusing on the issues most relevant to Koren's remaining claims. The court has considered all the evidence, whether cited or not.

At trial, Koren abandoned all of her claims except those arising out of a $5,000 loan agreement (Ex. 2), $551.60 for airplane tickets for Betancourt and her minor son (Ex. 8) and $470 for Betancourt's work permit (Ex. 8).

Betancourt and Abea came to the United States from Nicaragua in 2024. Abea came first and Betancourt followed around July 2 or 3, 2024. Abea and Betancourt both resided with Koren's sister (Betancourt's aunt), Larissa Betancourt ("Larissa") for a period of time initially. Larisa and Koren have separate residences in California. At Larissa's, Koren presented Ex. 2 to Betancourt for her to sign.

Ex. 2 is a type-written document in English. It contains handwritten acknowledgments in English, ostensibly signed or initialed by Betancourt, that pages 3 and 5 of Ex. 2 were read to her in Spanish and she understood them. Koren points to Ex. 2 as a "Loan Agreement" for a $5,000 loan to Betancourt that Koren seeks to collect in this case. Koren said she gave Betancourt $5,000 in cash to use for an apartment after Betancourt signed the document. Koren added that she typically keeps $15,000 in cash in her house for emergencies.

Betancourt does not speak or read English. She relied on a Spanish interpreter at trial. Unlike Koren who is bilingual and testified in English (sometimes correcting the interpreter's Spanish translations), Betancourt showed no indication of understanding English. She did not know when the court addressed her until the interpreter translated. Even when the court addressed defendant as "Ms. Betancourt" before asking a question, Betancourt's demeanor did not reflect any acknowledgment that the court was in fact addressing her until after the translator completed the interpretation.[1] The court shares these observations as the basis for the court's conclusion that Betancourt has effectively no comprehension of the spoken English language.

Betancourt demonstrated no greater ability in reading English when the court asked her about Ex. 2. She only recognized her signature and the Jul. 12, 2024 date she signed the document. The court finds Betancourt does not read English.

Ex. 2 also contains handwritten additions in Spanish that were translated into English for the court's benefit. Those provisions indicate that the "document was read aloud and explained in Spanish to Katherine Betancourt in the presence of the witnesses, and she stated that she fully understood its contents and had received the sum of $5,000 in cash." Ex. 2 at 4, 6, 8.

Betancourt and Abea testified that Koren never handed $5,000 in cash to Betancourt. Abea has never seen Betancourt with $5,000 in cash. Betancourt and Abea said that they came to the United States from Nicaragua under the humanitarian parole program. Koren agreed to pay their way and they each agreed orally to repay Koren $5,000 for her transporting them here.[2]

Abea testified that Koren analogized her arrangement with him and Betancourt to that of a "coyote" – someone who charges exorbitant sums to aid the illegal passage of an entrant into the United States. Abea found that analogy inappropriate since he and Betancourt entered the United States legally. Koren never refuted or denied that she made this analogy to Abea.

Betancourt acknowledged that she had orally agreed to pay Koren $5,000 for Koren to bring Betancourt to the United States. Betancourt admitted she still owed $3,327 of the $5,000

---

[1] In addition to Betancourt, Larissa and Koren (nee Betancourt) share the Betancourt surname. Other witnesses often referred to Larissa or Koren by using the Betancourt surname. As a result, even when the court began its question with "Ms. Betancourt," it appears reasonable that Betancourt might have thought the court was referring to Koren or Larissa. Only after the interpretation in Spanish rendered the context clear would it make sense for Betancourt to understand that the court was addressing her. All of that confirms to this court that Betancourt has no appreciable understanding of spoken English.

[2] Abea and Koren both testified that Betancourt's and Abea's formal program sponsor was Rixie Davis, someone whom Koren arranged and whom Betancourt and Abea never met personally. Koren had Davis available by Zoom as a trial witness but never called him to testify. She ran out of time and blamed the court. She asked the court to consider instead Ex. 5, Davis's sworn statement. The court has reviewed that statement but will not admit it as evidence because neither the court nor Betancourt had the opportunity to ask Davis questions. The court finds Ex. 5 largely irrelevant to this case in any event. Davis asserts that he served as humanitarian sponsor and denies that "money had been paid in exchange for humanitarian sponsorship." Davis does not say anything about whether Koren paid to bring Betancourt and Abea from Nicaragua to the United States, Betancourt's primary claim in this case and different in the court's mind than "humanitarian sponsorship." Even if Davis had testified to Ex. 5, the court would not have found it relevant to Koren's case. Davis's testimony would have had no impact on the court's findings.

she orally agreed to pay Koren. Koren did not say otherwise. Betancourt denied Koren ever gave her $5,000 in cash.

Abea emphasized how little he and his wife understood about the United States before they came here. Koren has lived here for years and is married to a retired police officer, a situation she uses threateningly when convenient. Like Betancourt, Abea testified through a Spanish translator. Like Betancourt, he showed effectively no spoken understanding of English. When the court asked him questions, his demeanor acknowledged that the court was addressing him. Unlike Betancourt who testified from the party's table, Abea testified from the witness stand. The court observed that difference in physical layout made it easier for Abea to appreciate when the court turned to speak directly to him while he testified. Given the layout of the courtroom, Betancourt did not benefit from such physical cues. Unlike Betancourt, no other trial participant shares Abea's surname, eliminating an additional source of ambiguity. Abea's facial expression did not register understanding the court's question until after the interpreter completed translation. Based on these observations, the court concludes Abea has no understanding of spoken English.

Juan testified that no loan ever existed. Juan is Betancourt's uncle and Koren's brother. Like Betancourt and Abea, Juan testified that Koren charged Betancourt and Abea each $5,000 to bring them to the United States from Nicaragua. Koren told Juan that she would add interest and double the repayment obligation to $10,000 when they stopped making payments.[3] Juan told Koren that would amount to extortion. Koren asks the court to discount Juan's testimony since she has pending civil and criminal cases against him in Nicaragua. She describes them as enemies.

Overall, the court does not find Koren credible. Koren testified in English and repeatedly offered unsolicited examples of how she wanted to help her niece, Betancourt. She offered how she paid for her work permit (which Betancourt denied) and to retain a Nicaraguan lawyer to help Betancourt and Abea get replacement passports when theirs went missing (Juan testified Koren told him she took the passports to ensure repayment). She emphasized how she wanted to help her niece as a new immigrant. The court found Koren's demeanor self-serving and not credible. Koren often looked away from the camera when making such assertions. She sounded rehearsed, often repeating certain phrases, and not genuine in offering those self-serving details. Her testimony generally appeared performative.

For instance, Koren repeated that she never served as sponsor for Betancourt and Abea. She said Bixie Davis served that role and Abea agreed. Koren made those assertions in her case in chief and in a case where no one alleged Koren served as Betancourt's or Abea's sponsor. Koren never directly denied that she paid for Betancourt and Abea to travel to the United States from Nicaragua. The court concludes that Koren used this literal and incomplete truth as a ruse to undermine Betancourt's defense. Koren wanted the court to believe that her not serving as their sponsor meant that she did not pay for their travel here.

---

[3] In August of 2024, Koren told Juan that she would hold Betancourt's and Abea's passports to force their repayment.

Koren's stated desire to help Betancourt contradicts the premise of her case -- how Koren could honestly maintain such feelings while also taking the calculated time and effort to have Ex. 2 prepared, translated, notarized and witnessed, all within days of Betancourt arriving in the United States from Nicaragua for the first time with no understanding of English. No witness corroborated Ex. 2 and Koren's assertion that she gave Betancourt $5,000 in cash. The court finds inconsistent and not credible that an aunt interested in helping her new immigrant niece would have her sign a document in her non-native language to document informal financial help between caring family members. The court finds Koren did not give Betancourt $5,000 in cash.

Koren squandered much of her limited trial time covering topics largely irrelevant to her claim. The court does not make findings regarding these topics because they do not impact the outcome of the case. This testimony did give the court an opportunity to observe the parties' behavior and demeanor during these irrelevant and emotionally challenging topics. Those observations informed the court's credibility determinations. The court describes those observations for the record to provide further context for the court's findings.

Fairly early on in her testimony, Koren asserted that Abea is Betancourt's boyfriend, not her husband. Koren added that Abea had begun a relationship with another woman, causing tension with Betancourt and the shared living arrangement with Larissa. Betancourt became visibly upset at this point in Koren's testimony. Betancourt remained upset through the duration of Koren's testimony, never regaining her composure. Koren appeared to delight in offering this unsolicited and irrelevant testimony. She repeated it gratuitously at different points throughout her testimony in what the court assessed as Koren's deliberate attempt to antagonize Betancourt.

While Abea and Betancourt both described the stress caused to their lives by actions they attribute to Koren, neither Abea nor Betancourt expressed or showed anger or resentment toward Koren. Betancourt and Abea expressed a sincere desire to bring an end to this matter and the torment Koren has caused them. As noted above, Betancourt even admitted owing Koren some $3,000 of a promise to pay her $5,000, but under very different circumstances than the ones Koren alleged. The court concludes from these observations that Koren has some animus toward Betancourt. This dynamic impacts the court's view of Betancourt as generally biased and unreliable. The court found both Betancourt and Abea credible and reliable, both because of the substance of their testimony and their (admittedly different but equally credible) demeanors.

Despite Betancourt starting the trial composed, she cried through most of her testimony and the witnesses', visibly and credibly upset by their accounts. Some of the contextual testimony by Koren, Abea and Juan included allegations of Koren taking the passports of Abea and Betancourt as ransom for their continued payments, of Koren sending social services and police to locations in North Carolina and Vermont where Betancourt and Abea were residing because Koren alleged that Betancourt and Abea abused their minor son and Koren's placing an Apple air tag in the family suitcase of Betancourt and Abea so that Koren could track them. The court shares that testimony without making findings as context for why the court concludes that Betancourt credibly demonstrated behavior consistent with the strain and stress of the events surrounding this case.[4]

---

[4] The court has also observed Koren, Abea and Betancourt in the ongoing trial in case number 26-CV-00693, an action brought by Koren against Abea to collect on a separate loan.

The court does credit Betancourt's admission that Ex. 2 bears her signature. Ex. 2 remains a document mostly in English signed by Betancourt, who knows no English, within days of her arrival in the United States from Nicaragua for the first time. The court credits Abea's testimony regarding how little he and Betancourt knew about the country as new immigrants, particularly when contrasted with Koren who has lived here for years and, by her own account, has numerous civil cases pending (including against Abea and Juan), giving Koren greater experience with the legal system. Under these circumstances, the court finds Betancourt signed but did not understand Ex. 2 completely.

The court also finds Juan credible. Koren tried to discredit him before he testified. After he testified, she repeated her assertion that they are enemies because of the civil and criminal cases she has against him in Nicaragua. Juan never expressed or demonstrated ill will towards his sister. He never reacted with undue emotion to Koren's accusations. Upon hearing them, Juan shook his head and mildly chuckled. He did not respond verbally, although he remained unmuted on Zoom, and he did not demonstrate the emotional reactivity of the "enemy" Koren claimed him to be. Overall, Juan's demeanor through testimony and accusations by Koren instead reflected maturity and credibility.

The court finds that Ex. 2 and Koren's testimony do not accurately reflect the payment obligation of Betancourt to Koren. Because of the court's credibility determinations, the court concludes that Betancourt's obligation arises from her oral agreement to pay $5,000 to Koren for Koren paying for Betancourt's travel from Nicaragua to the United States. The court further finds that Betancourt, as she testified, has an outstanding (but unenforceable, as noted below) debt on that oral agreement to Koren of $3,327.

The court concludes Koren has not met her burden to prove any repayment obligation of Betancourt for the airline tickets and work permit shown on Ex. 8. As for the airline tickets, Koren offered virtually no testimony regarding the need or time of the tickets, other than saying they were for Betancourt and her son. Koren offered no details about what necessitated the flights or her payment for them. Koren offered no testimony that she had any agreement with Betancourt about any repayment obligation. For the work permit, Betancourt testified she paid for her own work permit. Koren did not refute it.

## II.     Discussion

Koren has the burden to prove her case. *E.g.*, *Kennedy v. Williams*, 114 Vt. 54, 57 (1944) ("That the [claimant] had the burden of proof is elementary."). "To state a breach of contract claim under Vermont law, Koren must prove (1) the existence of a contract, (2) breach of the contract, and (3) damages." *Mooers v. Middlebury Coll.*, No. 2:20-CV-00144, 2021 WL 4225659, at *5 (D. Vt. Sept. 16, 2021) (Reiss, J.) (citing *Lapoint v. Dumont Constr. Co.*, 128 Vt. 8, 10 (1969)).

As the court found, Betancourt signed Ex. 2 but it does not reflect the agreement between her and Koren. The court found Betancourt's testimony more credible than Koren's. Koren also bears the risk of mistake in this case.

> A party bears the risk of a mistake when
> (a) the risk is allocated to him by agreement of the parties, or
> (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
> (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

Restatement (Second) of Contracts § 154 (1981). Under subsections (b) and (c), the court concludes Koren appropriately bears the risk of mistake. Koren drafted Ex. 2. *Szczotka v. Snowridge, Inc.*, 869 F. Supp. 247, 250 (D. Vt. 1994) ("[L]anguage of the agreement is construed strictly against its drafter."). Koren chose to draft it in English, knowing that Betancourt did not understand English. Even though Koren claims to have had Ex. 2 translated into Spanish, the circumstances of Koren's arranging execution of Ex. 2 within days of Betancourt's arrival in the United States make it fair to allocate Koren the risk of mistake in Ex. 2. As a result, the court finds Ex. 2 does not represent a meeting of the minds between Koren and Betancourt and does not constitute an agreement as a matter of law.

> Even if it did, the court would not enforce it.

> Under Vermont law, terms of a contract may be avoided as unconscionable if they are procedurally or substantively unfair. Unconscionability may be based upon evidence of some overreaching on the part of one of the parties such as that which results from an inequality in bargaining power or under other circumstances in which there is an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to that party. Thus, unequal bargaining power coupled with lack of meaningful choice, plus unreasonably favorable contract terms, may supply grounds for avoiding the terms of a contract on unconscionability grounds. . . . Vermont law does not absolutely require procedural unconscionability to find a contract unconscionable.

*Eisen v. Venulum Ltd.*, 244 F. Supp. 3d 324, 344 n. 8 (W.D.N.Y. 2017) (citations and internal quotations omitted). Ex. 2 contains all the bases of unconscionability. It reflected drastically unequal bargaining power between the English-speaking multi-year United States resident Koren and the non-English-speaking new American immigrant Betancourt. Koren gave Betancourt no meaningful choice under these circumstances but to sign Ex. 2. Betancourt knew nothing of the United States, including its language, when Koren chose to confront her with Ex. 2 within a few days of her arrival. Ex. 2 unreasonably favors Koren who drafted it, understood the language in which it was drafted and knew better the legal system in the United States under which she seeks to enforce it. Koren occasionally pointed out how Betancourt never went to the authorities until months later in their interactions, but the court finds those actions reasonable and consistent with

a new American immigrant unaccustomed to this country's ways and potentially wary of institutional authorities.

For the same reason, the court finds unconscionable the oral agreement that Betancourt made with Koren, under which Betancourt still owes some $3,000. Koren had superior bargaining power as an American resident with many years' experience in this country's ways and, by her own actions and admissions, this country's legal system. Betancourt knew little if anything of America. Nothing in the trial record suggest Betancourt had any meaningful alternative to accepting Koren's unilateral offer if she wanted to join her husband and reunite her family in this country. The arrangement unreasonably favors Koren who effectively took advantage of Betancourt's circumstances. Koren knew Betancourt wanted to reunite her family and that her husband was already in California with Koren's sister.

In addition, the court finds the oral agreement between Koren and Betancourt unenforceable on grounds of public policy.

> "In general, if a court will not, on grounds of public policy, aid a promisee by enforcing the promise, it will not aid him by granting him restitution for performance that he has rendered in return for the unenforceable promise. Neither will it aid the promisor by allowing a claim in restitution for performance that he has rendered under the unenforceable promise. It will simply leave both parties as it finds them, even though this may result in one of them retaining a benefit that he has received as a result of the transaction." 2 Restatement (Second) of Contracts § 197, Comment *a,* p. 71 (1979); see, *e.g., Worlton v. Davis,* 73 Idaho 217, 222–223, 249 P.2d 810, 814 (1952).

*Gen. Dynamics Corp. v. United States*, 563 U.S. 478, 488 (2011). This court finds Koren's agreement with Betancourt unenforceable. *See United States v. Si Lu Tian,* 339 F.3d 143, 155 n.2 (2d Cir. 2003) ("[A]lien smuggling agreements are illegal and unenforceable . . . .") (citation omitted).

## III.   Order

For the reasons set forth above, the court will enter judgment for Betancourt.

Koren may not try to collect on Betancourt's oral promise in or around June 2024 to pay Koren $5,000 to transport her to the United States from Nicaragua.

Betancourt has no further payment obligations to Koren for that promise which the court finds unenforceable as a matter of law.

Electronically signed pursuant to V.R.E.F. 9(d) on June 25, 2026.

Colin Owyang
Superior Court Judge